# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

SITA INFORMATION NETWORKING
COMPUTING USA, INC.,

        Plaintiff,

        v.                Civ. Act. No. _____

FAUSTO CAPOTE, HUGO CORDOVA and
KRONOS SOFTWARE SOLUTIONS, INC.,

        Defendants.

---

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

**COMES NOW** SITA Information Networking Computing USA, Inc. ("**SITA**"), by and through undersigned counsel, and alleges as follows against Defendants Fausto Capote ("**Capote**") Hugo Cordova ("**Cordova**"), and Kronos Software Solutions, Inc. ("**Kronos**") (collectively "**Defendants**"). SITA alleges each of the following facts upon personal knowledge unless otherwise noted.

### INTRODUCTION

1.

This is a case involving two former SITA employees who have misappropriated SITA's software and source code and used it to start a new company, Kronos. Kronos has converted SITA's trade secrets for its own use without permission and has been attempting to solicit and steal SITA's customers as recently as within the last two weeks as evidenced by email communications which SITA possesses. SITA has reason to believe that Kronos will continue to solicit its customers while using the misappropriated software this week and in the coming weeks. Therefore, SITA seeks emergency injunctive relief, in addition to damages, to prevent

and/or stop Defendants' illegal solicitation of its customers and unauthorized use of SITA's confidential business information and trade secrets.

## PARTIES & PERSONAL JURISDICTION

2.

SITA is a Delaware corporation, which maintains its principal office at 3100 Cumberland Boulevard, Suite #200, Atlanta, Georgia  30339.  SITA is duly registered to conduct business in Florida.

3.

Defendant Capote is an individual Florida resident who may be served with process at 16116 SW 149th Terrace, Miami, Florida  33169, or wherever he may be found.  Defendant Capote is subject to the general personal jurisdiction of this Court.

4.

Defendant Cordova is an individual Florida resident who may be served with process at 11962 SW 126 Lane, Miami, Florida  33186, or wherever he may be found.  Defendant Cordova is subject to the general personal jurisdiction of this Court.

5.

Defendant Kronos is a Florida corporation which may be served with process via its registered agent, Fausto Alfredo Capote, 16116 SW 149th Terrace, Miami, Florida  33169. Defendant Kronos is subject to the general personal jurisdiction of this Court.

## SUBJECT MATTER JURISDICTION

### 6.

The Court has subject matter jurisdiction based on 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and there is complete diversity between the Plaintiff and Defendants.

### 7.

The Court has supplemental jurisdiction over SITA's state-law claims pursuant to 28 U.S.C. § 1367.

## FACTS RELEVANT TO ALL COUNTS

### 8.

On July 10, 2001, SITA announced the purchase of substantially all business and assets of a company called, RPA Airline Automation Services, Inc. f/k/a Rene Perez & Associates, Inc. ("**Rene Perez**").

### 9.

One of the assets acquired from Rene Perez was a computer program called Passenger Revenue Accounting ("**PRA**").[1]

### 10.

PRA is a very specialized type of accounting software used by commercial airlines to account for and divide ticket revenues[2] among carriers. Airline industry rules and regulations for dividing ticket revenues can be fairly complex in situations where, for example, a passenger

---

[1] In 1996, Rene Perez registered the copyright for the PRA software. The registration number is TX 4-317-645. SITA took an assignment of the copyright from Rene Perez in 2001 as part of the acquisition.

[2] Dividing ticket revenues means the way in which two or more airlines divide the purchase price from the sale of a single airline ticket among themselves.

books a multi-leg flight involving multiple airlines because the airlines must share the revenue from the single ticket sale. As one of its functions, the PRA software automatically applies the industry accounting rules, divides the revenue among carriers, and then feeds the appropriate dollar amounts into the various airlines' general ledgers.

11.

In addition to software, SITA acquired Rene Perez's existing customers and hired more than 40 of its employees, including Defendants Capote and Cordova.

12.

On June 27, 2001, Defendant Capote accepted employment with SITA as a "Product Support Analyst (Grade 4A)." Defendant Capote managed the installation and support of the PRA software onto the customers' computer systems. A true, correct and complete copy of Defendant Capote's signed offer letter is attached as **Exhibit A** hereto.

13.

On June 29, 2001, Defendant Cordova accepted employment with SITA as a "Project Manager (Grade 6)." Defendant Cordova was the highest grade employee in SITA's Miami Office, and he was responsible for managing all PRA software programmers. A true, correct and complete copy of Defendant Cordova's signed offer letter is attached as **Exhibit B** hereto.

14.

After joining SITA, Defendants Capote and Cordova worked in development, programming, implementation, maintenance and customer support roles respecting the PRA software.

4

15.

For approximately 13 years, SITA has licensed and provided support services for the PRA software to several of the largest carriers in the commercial airline industry, including, for example, XXXXXX ("**XXXXXX**") and ZZZZZZZZ ("**ZZZZZZ**").[3]  At the peak, SITA had about 21 customers licensing PRA software.  Presently, about 14 customers license PRA from SITA and have contracts with SITA to support the software.  Current monthly revenue from the PRA software exceeds $100,000.00.

16.

In the fall of 2012, SITA made a business decision to "sunset" its support of the PRA software.  This would be a gradual process, because some of SITA's customer contracts required continued support services through April 2018.  It was anticipated that SITA would gradually phase out and terminate the employment of the individuals supporting the PRA software as the various contracts expired.  Defendant Cordova's employment would be terminated last since he was the manager.

17.

Because Defendant Cordova was the manager overseeing SITA's PRA Software Development Team, SITA included him in discussions concerning its plan to sunset the PRA software as early as September 2012.  In reaction to these discussions, Defendant Cordova made a formal proposal to SITA to buy the PRA software and to start his own business.  However, SITA rejected Defendant Cordova's proposal based on the weak business case.

---

[3] SITA will file a motion to substitute pages under seal containing the un-redacted names of its customers, which are part of SITA's confidential business information.

18.

In December 2012, SITA informed its PRA Software Development Team that it would be gradually phasing out the PRA software. SITA specifically told its employees that the process would happen over a period of years, and that SITA wanted each of its employees to remain employed by SITA for as long as possible. For those who remained dedicated, SITA offered generous severance packages, including, in some cases, several months of continued salary and benefits. SITA also offered to provide its employees as much notice as possible before their positions were scheduled to be phased out.

19.

Also in December 2012, SITA told its customers that it would eventually phase out the PRA software, and that it would phase out employee support for the product over the next several years as the terms of the various support contracts expired. SITA informed its customers that, after the contract terms expired, SITA would license the continued use of the PRA software to any customer that wanted to use it, and that, assuming acceptable terms could be reached, SITA would also give licenses to third-party software support venders to service the PRA software.

20.

Defendant Capote's position was eliminated June 28, 2013.

21.

On July 15, 2013, Defendant Capote signed an Agreement and General Release (the "**Separation Agreement**") with SITA. A true, correct and complete copy of the Separation Agreement is attached as **Exhibit C** hereto.

22.

The Separation Agreement provides Defendant Capote with a generous severance package including 37 weeks of salary, 37 weeks of health benefits, 3 months of outplacement assistance and a $3,977 SIRP payment (a prorated annual performance bonus), among other benefits. (*See* Separation Agreement ¶ 4, at Ex. C hereto.)

23.

Without the Separation Agreement, Defendant Capote would only have been entitled to eight weeks of salary and a substantially reduced amount of benefits. (*See* Separation Agreement ¶ 2, at Ex. C hereto.)

24.

In consideration for the severance package, Defendant Capote agreed to refrain from soliciting or interfering with SITA's customers for one year after his employment terminated. He also agreed not to disclose SITA's confidential information and trade secrets for two years (or longer pursuant to the Georgia Trade Secret Act) after his employment terminated. **Significantly, Defendant Capote affirmatively represented at the time he executed the Severance Agreement, that he had not retained any of SITA's confidential information or trade secrets, and that he would not subsequently seek to acquire any of SITA's confidential information or trade secrets.**

25.

In particular, by signing the Separation Agreement, Defendant Capote agreed to a two-year non-disclosure provision, which states:

> 8.    NON-DISCLOSURE.  In exchange for the consideration set forth in Paragraph 4 of this Agreement and General Release, for two (2) years after the termination of EMPLOYEE'S employment, EMPLOYEE will not, directly or indirectly, for any reason, for his

7

own account, or on behalf of or together with any other person, disclose any Confidential Information of the COMPANY and its subsidiaries and affiliates. Provided however, that if the Confidential Information is deemed a trade secret under Georgia law, then the period for nondisclosure shall continue for the applicable period under Georgia Trade Secret laws in effect at the time of EMPLOYEE'S termination.   For purposes of   this Agreement and General Release, "Confidential Information" shall mean any and all trade secrets, financial information and other information considered by the COMPANY as being confidential and concerning the business and affairs of the COMPANY, including but not limited to (a) product specifications, discoveries, improvements, processes, marketing and service methods or techniques, formulae, designs, styles, specifications, data bases, **computer programs (whether in source code or object code)**, know-how, strategies, data, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, and any other information, however documented, that is a trade secret of the COMPANY, or any of its affiliates within the meaning set forth in O.C.G.A. § 10-1-761; (b) information concerning the business and affairs of the COMPANY (which includes, but is not limited to, historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, business plans, the names and background of key personnel, personnel training and techniques and materials, and sales techniques and materials of the COMPANY), however documented; and (c) notes, analyses, compilations, studies, summaries, and other material prepared by or for the COMPANY containing or based, in whole or in part, on any information included in the foregoing; provided, however, Confidential Information shall not include any information that EMPLOYEE demonstrates was or became generally known or available to the public other than as a result of an unauthorized or unlawful disclosure directly or indirectly by EMPLOYEE.

(*See* Separation Agreement ¶ 8, at Ex. C hereto) (emphasis added.)

26.

Further, Defendant Capote agreed to a one-year non-solicitation and non-interference provision, which states:

9.   NON-SOLICITATION AND NON-INTERFERENCE.  In exchange for the consideration set forth in Paragraph 4 of this Agreement and General Release, for one (1) year after the

8

termination of EMPLOYEE's employment, EMPLOYEE will not, directly or indirectly, for any reason, for his own account, or on behalf of or together with any other person:

a.  solicit, induce, or conspire with, or attempt to solicit, induce, or conspire with, any of the officers or employees of the COMPANY or any of its affiliates (the COMPANY and its affiliates collectively being "the COMPANY" for purposes of this Section 9) with whom EMPLOYEE has dealt with or otherwise has or had direct dealings with during the twenty-four (24) month period prior to the termination of EMPLOYEE's Employment to terminate their employment or relationship with, or to compete against, the COMPANY;

b.  solicit or induce, cause, request, encourage or attempt to solicit or induce, directly or indirectly, any of the customers of the COMPANY, with whom EMPLOYEE has dealt with or otherwise has or had direct dealings with during the twelve (12) month period prior to the termination of EMPLOYEE's employment to change or discontinue, in whole or in part, its existing or business relationship with Employer and/or to become a customer or vendor of any other person or entity or communicate with any person or entity for such purpose, or authorize or approve the taking of such actions by any person or entity.

(*See* Separation Agreement ¶ 9, at Ex. C hereto.)

27.

Finally, Defendant Capote affirmatively represented that he had returned all of SITA's documents and information, including, but not limited to, SITA's intellectual property, trade secrets or confidential information, as follows:

13.  EMPLOYEE warrants, represents, covenants, and agrees that as of the date he executes this Agreement, he has returned to the COMPANY all COMPANY documents, records, property, and information in any form, including, but not limited to, COMPANY files, electronic messages, notes, drawings, records, business plans and forecasts, financial information, specifications, vendor information, business planning or strategy information, information about COMPANY employees, customer identity information, tangible property (including, but not limited to, computers), intellectual property, credit cards, identification

> badges, parking badges, and keys; and any materials of any kind which contain or embody trade secrets and other confidential information of the COMPANY (and all embodiments, copies, or extracts thereof), which EMPLOYEE has acquired or possessed during EMPLOYEE'S employment. EMPLOYEE also warrants, represents, covenants, and agrees that he has not made or retained and shall not make or retain any embodiment, copy, or extract thereof.

(*See* Separation Agreement ¶ 13, at Ex. C hereto.)

28.

On his own, and acting in concert with Defendant Cordova, Defendant Capote has breached each of the restrictive covenants quoted above. Further, Defendant Capote's representation that he had not retained, and would not seek to acquire any of SITA's confidential information or trade secrets was false at the time it was made and Defendant Capote knew this.

29.

On January 12, 2013, Defendant Cordova, while still employed by SITA, registered the Internet domain name http://kronospra.com through a domain registrar called MelbourneIT.

30.

Defendant Cordova used MelbourneIT's "My Private Registration" service, while still employed by SITA, in an attempt to register the domain in secret and shield himself from association with Kronos.

31.

However, a recent WHOIS search shows the date of registration and identifies the registrant as "Hugo Cordova." (*Id.*) A true, correct and complete copy of the WHOIS results which shows Cordova's registration of the <KRONOSPRA> domain name is attached as **Exhibit D** hereto.

10

32.

Then, on January 17, 2013, Defendants Capote and Cordova, who were both employed by SITA at the time, electronically filed Articles of Incorporation for Defendant Kronos with the Florida Secretary of State. A true, correct and complete copy of the Articles of Incorporation is attached as **Exhibit E** hereto.

33.

As with the domain name, Defendants attempted to incorporate Kronos in secret. At the time of filing, neither of the individual Defendants publically associated themselves with Defendant Kronos. Instead, the Articles of Incorporation list an individual named Sudhir Kumar—a former SITA employee who now works for one of SITA's competitors—as the incorporator, registered agent, and the sole original officer and director of Kronos.

34.

However, on July 15, 2013, **on the same day that Defendant Capote signed his Separation Agreement and was no longer employed by SITA,** Defendants Cordova and Capote filed a form with the Florida Secretary of State changing the registered agent for Kronos from Sudhir Kumar to Defendant Capote and listing Defendant Cordova as the "contact person" for Kronos. The Statement of Change lists Defendant Capote as the "PTSD" (*i.e.*, the President, Treasurer, Secretary and Director) of Defendant Kronos. As of this filing, Mr. Kumar apparently no longer holds an office in the corporation, assuming he ever held one in the first place. A true, correct and complete copy of Kronos' Statement of Change of Registered Agent is attached as **Exhibit F** hereto.

11

35.

In an email to XXXXXX, Defendant Kronos represented that, by December 2013, it had begun hiring employees, acquiring insurance, purchasing Internet connectivity, setting up its accounting software, and undertaking other acts which would be necessary to start servicing customers using the PRA software.

36.

Also in December 2013, one of the individual Defendants uploaded the source code for the PRA software from SITA's secure data center in Atlanta, Georgia, to a pair of servers allegedly owned by XXXXXX.

37.

On January 1, 2014, Defendant Kronos began servicing the PRA software directly on XXXXXX's servers, while Defendants Cordova and another SITA employee named George Karakunnel—who were still employed by SITA at the time—stopped providing support to XXXXXX on behalf of SITA.

38.

In particular, on January 9, 2014 at 16:15, Defendant Capote sent an email on behalf of Kronos to XXXXXX in which he stated:

> **As of January 1st. 2014, Kronos personnel has been supporting XXXXXX PRA directly from XXXXXX servers, XXXXXX07,XXXXXX02. All work has stopped on SITA's side.**
>
> George Karakunnel is expected to be formally discharged by SITA in the next few days/weeks. Has XXXXXX formally notified SITA to stop PRA support as of January 1st. 2014?
>
> Hugo will remain with SITA a few more weeks to take care of any loose ends on the XXXXXX migration.

> **In practical terms XXXXXX is receiving PRA dedicated
> support from Kronos as of January 1st.2014.  It is Kronos'
> understanding that billing has begun as of this date.  Has
> XXXXXX notified SITA to stop PRA billing?**

A true and correct, but partially redacted, copy of this email chain is attached as **Exhibit G**

hereto (emphasis added).

39.

Then, in the same email chain, Defendant Cordova wrote:

> In my case, I will remain with SITA a bit longer **to coordinate any
> pending items from the XXXXXX migration and finalize other
> customers' migrations**; however, **Fausto will be coordinating all
> support with George under Kronos.**  We have made available
> additional resources as well in case it is necessary.
>
> As Fausto states it is very important that SITA gets notified of the
> termination of PRA Support and the consequent stopping of
> billing.

(*See* Ex. G, p. 5 (emphasis added).)

40.

Significantly, in the above email chain, Defendant Cordova admitted that he would be

acting as an employee of SITA and using SITA's own computing resources to migrate both

XXXXXX and "other customers"—**which is plural**—from SITA to Kronos.  Kronos' plan was

not just to take the business of XXXXXX; they apparently intended to take all of SITA's PRA

customers.

41.

Then, on January 24, 2014, the Head of IT Services from XXXXXX emailed SITA's UK

Account Director asking about the cancellation of XXXXXX PRA software support contract

with SITA.  This email informed SITA about the Defendants' tortious acts, because it included a

forward of the prior emails (transcribed above) from Defendants Cordova and Capote, who were

13

writing on behalf of Defendant Kronos, asking XXXXXX to cancel its service contract with SITA.

42.

After receiving the forwarded emails from XXXXXX, SITA's Mike Ellis called Hugo Cordova to ask him about his involvement with Defendant Kronos. During this call, Defendant Cordova said he had no knowledge of or involvement with Defendant Kronos even though he was publicly listed as the "contact person" for the company and was also listed as the registrant of the Internet domain name for Kronos. In fact, Defendant Cordova said he believed Kronos to be an Indian company, and also that he thought the company might spell its name with a "Ch," as in "Chronos." Despite clear evidence to the contrary, Defendant Cordova specifically denied any involvement with Defendant Kronos.

43.

Once SITA confirmed its suspicion that Defendants were actively marketing, selling and servicing the PRA software through Kronos, SITA terminated the employment of Defendant Cordova for cause. Significantly, during the meeting in which SITA terminated Defendant Cordova's employment, he no longer denied affiliation with Kronos or his plan to sell PRA software support services to SITA's customers. Instead, he simply asked why SITA cared about Kronos' actions given SITA's plan to sunset its PRA software support.

44.

Further, on January 23, 2014, SITA sent a letter to Defendant Capote, reminding him of his duties not to solicit SITA's PRA customers and to preserve the confidentiality of SITA's trade secrets and business information. A true, correct and complete copy of this letter is attached as **Exhibit H** hereto.

45.

Providing support services to any of SITA's PRA software customers REQUIRES Defendant Kronos to have a copy of the SITA's confidential PRA source code.

46.

Software has two types of codes – source code, and object code.[4]  The PRA source code is written in a programming language, which is a kind of English that can be read and understood by a human with the appropriate training.  However, computers do not speak English; they speak binary, which is a language comprised of ones and zeroes.  Thus, after the source code for a program has been written, it is run through a special kind of program called a "compiler," which is responsible, in the most general terms, for translating the program from source code into object code.  Object code is in binary and can be understood by a computer, and it is the version of a program that gets installed on a machine.  However, if the program needs an upgrade or has a bug that must be fixed, a programmer cannot generally read and write object code to fix the problem.  Instead, the programmer must return to the source code, identify the issue, write a solution in the programming language of the source code (sometimes called a "software patch") and then recompile the whole program back into object code which can be executed by a computer.  Thus, in order to provide software support services for a program like PRA, the support personnel has to have access to the source code; otherwise he cannot add new features or write software patches requested by the customer.  Furthermore, before a recompiled program

---

[4] "The 'literal elements' of a computer program are its source and object code." *Liberty American Ins. Group, Inc. v. WestPoint Underwriters, L.L.C.*, 199 F.Supp.2d 1271, 1298-99 (M.D. Fla. 2001).  "Source code is a symbolic language that humans can read, whereas object code is a translation of the source code into a series of zeroes and ones that is readable by a computer." *Id.*  "It is well settled that the literal elements of computer programs are subject to copyright protection." *Id.*; *see also Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 702 (2d Cir. 1992).

can be taken live, it must be tested offline so that any bugs can be identified and fixed.  Thus, if Defendants have been supporting PRA for XXXXXX since January 1, 2014, as they claim, they must not only have the source code for the program, but they must also have access to a compiler, and to a machine on which they can test the program after recompiling it.

47.

Significantly, none of the Defendants have ever purchased the PRA software from SITA or a license to copy, use, modify or support the PRA software.

48.

In recent weeks, several of SITA's customers have been inquiring about early terminations of their PRA support contracts, and some of them stated that they would be considering moving their business to Kronos.

49.

In January 2014, SITA received notice that ZZZZZZ wanted an early termination of its support contract with SITA in order to transition its business to a third party support company, for which Kronos was being considered.

50.

Neither ZZZZZZ nor Kronos have any license or other legal right, whether contractual or statutory, to use the PRA software without SITA's consent.

51.

Because Defendant Cordova remained a SITA employee until last week, he was able to control the flow of information between SITA and its customers, playing both sides against the other for the secret benefit of Kronos.

16

52.

Because none of the Defendants have ever purchased the PRA software or a license for the PRA software from SITA, none of the Defendants have any legal right to use, sell, modify or support the PRA software, which is owned exclusively by SITA.

53.

SITA did not discover Defendants' scheme until January 24, 2014, when the Head of IT Services from XXXXXX forwarded the above-referenced email to SITA.

## COUNT I

### (MISAPPROPRIATION OF TRADE SECRETS)

54.

SITA repeats and re-alleges the allegations of Paragraphs 1-53 above as if the same were set forth verbatim herein.

55.

The Florida Trade Secret Act, Fla. Stat. § 688.001, *et seq.*, prohibits misappropriation and threatened misappropriation of trade secrets.

56.

As described above, Defendants have retained and are using SITA's PRA software, source code and related proprietary information. This information qualifies as trade secrets under the Florida Trade Secrets Act.

57.

The information misappropriated and retained by Defendants contains code, software and technical and non-technical data and compilations of information and data that are not commonly known to the public; derives economic value from not being commonly known to the public and

17

by not being readily ascertainable by proper means; and is the subject of reasonable efforts by SITA to maintain its trade secret status.

58.

SITA undertakes reasonable efforts to maintain the secrecy of its PRA source code, which is stored in SITA's secure data center in Atlanta, Georgia. The data center is password protected and only accessible by certain SITA employees. Defendants had to have login credentials and passwords to obtain a copy of the code. Every time Defendants needed to make a modification to the source code while employed by SITA, they were required to go through a check-out and check-in process specifically designed to enable SITA to review who had accessed the code. Moreover, when Defendant Capote left SITA, he was given a 37-week severance package in exchange for his agreement to maintain the confidentiality of SITA's confidential information and trade secrets, which would include the source code for PRA. For the most part, SITA's customers are not granted access to the PRA source code, but for any who are, SITA requires them to sign licensing agreements which contain provisions to protect the confidentiality of the code.

59.

Defendants knew or should have known of the trade secret status of the information. They were provided extensive training and access to SITA's trade secrets, giving rise to contractual and statutory obligations to maintain the secrecy of the company's trade secrets and to strictly limit their use to SITA's business activities and for the exclusive benefit of the company.

18

60.

Defendants have acquired, disclosed, or used the trade secret information without the express or implied consent or authority of SITA.

61.

The continued retention, disclosure or use of SITA's trade secrets by Defendants constitutes a continuing misappropriation of trade secrets.

62.

As a result of Defendants' conversion of SITA's property, SITA is entitled to compensatory damages in an amount to be proven at trial.

63.

SITA is entitled to temporary, preliminary and permanent injunctive relief to enjoin additional or further disclosures and unlawful uses of its trade secret information under the Florida Trade Secrets Acts.

## COUNT II

### (BREACH OF CONTRACT -- DEFENDANT CAPOTE)

64.

SITA repeats and re-alleges the allegations of Paragraphs 1-53 above as if the same were set forth verbatim herein.

65.

In his Separation Agreement, Defendant Capote agreed not to solicit SITA's customers or to interfere with SITA's business relationships for a period of one year. He has breached this contract by forming Kronos and soliciting SITA's customers as described above.

19

66.

In his Separation Agreement, Defendant Capote agreed not to disclose SITA's confidential information for a period of two years.  He has breached this agreement by supplying SITA's computer software and confidential information to Kronos and its customers as described above.

67.

In his Separation Agreement, Defendant Capote represented that he had not retained any of SITA's trade secrets or confidential information, and he agreed that he would not receive any of this information after his departure from SITA.  At a minimum, he has breached this agreement by receiving the source code for SITA's PRA software on behalf of himself as Kronos.

68.

SITA has been financially damaged by Defendant Capote's breaches of the Separation Agreement.  These damages include paying additional severance payments and benefits to which Defendant Capote was not entitled.  SITA's damages also include the termination of existing contracts to provide PRA software support to SITA's customers.

## COUNT III

### (FRAUDULENT INDUCEMENT OF THE SEPARATION AGREEMENT)

69.

SITA repeats and re-alleges the allegations of Paragraphs 1-53 above as if the same were set forth verbatim herein.

70.

At least six months before Defendant Capote's employment with SITA was terminated, the Defendants were already working to establish Defendant Kronos for the purpose of providing PRA software support services to customers which they intended to poach from SITA.

71.

As an inducement to receive the severance benefits provided by SITA in the Separation Agreement, Defendant Capote made false representations that he would not solicit SITA's customers, and that he did not have and would not use or convert SITA's trade secrets or confidential information.

72.

Similarly Defendant Cordova, at a time when he had a duty to disclose, made a fraudulent omission in order to induce SITA into providing the Separation Agreement for Defendant Capote and into continuing to employ Defendant Cordova. Defendant Cordova was the Manager in charge of SITA's PRA Software Development Team, and he had a legal duty to disclose to SITA the information he knew concerning his and Defendant Capote's involvement with Defendant Kronos. Defendant Cordova failed to disclose this information to SITA.

73.

Defendant Capote and Defendant Cordova made misrepresentations with scienter. Defendants needed to perform substantial work to get Defendant Kronos into a position where it could begin transacting business, and, until Kronos could begin generating its own revenue to pay salaries, Defendants intended to continue drawing salary or severance payments from SITA.

74.

Defendants made their misrepresentations and omissions intentionally to induce SITA to make several months' worth of severance payments to Defendant Capote over and above what he would have normally been entitled to receive.

75.

SITA justifiably relied upon Defendant Capote's misrepresentations and Defendant Cordova's omissions by paying the severance payments and other benefits to Defendant Capote.

76.

SITA has been financially damaged by the misrepresentations, *inter alia*, through the payment of additional, unearned severance benefits, and through the cancellation of contracts for SITA to provide PRA software support services to SITA's customers.

77.

As a result of the fraudulent inducement of the Separation Agreement, SITA is entitled to rescind the contract and sue for damages, including a return of the improperly paid severance benefits.

## COUNT IV

### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)

78.

SITA repeats and re-alleges the allegations of Paragraphs 1-53 above as if the same were set forth verbatim herein.

79.

Defendants have acted improperly and without privilege to infringe SITA's trade secrets and other rights in the PRA software, and to interfere with SITA's relationships with the customers to which SITA was providing PRA software access and support.

80.

Defendants acted purposely and with malice with the intent to injure. Their conduct was especially malicious because the individual Defendants were all employed by and receiving salaries from SITA while they were actively attempting to interfere with SITA's contracts.

81.

Defendants have induced at least one party to seek termination of its business relationship with SITA, and, in Defendant Cordova's own words, were working to "**finalize other customers' migrations**" from SITA to Kronos.

82.

Defendants have caused SITA financial injury, including lost revenue from selling PRA software support services.

**COUNT V**

**(UNJUST ENRICHMENT)**

83.

SITA repeats and re-alleges the allegations of Paragraphs 1-53 above as if the same were set forth verbatim herein.

84.

By improperly converting and using SITA's property and trade secret information, Defendants have received a personal benefit to the detriment of SITA. It would be unjust and unconscionable for Defendants to retain this benefit.

85.

As such, Defendants should be divested of this unjust benefit and be required to repay to SITA the amount of all proceeds received by Defendants for their personal benefit and enjoyment as a result of the use and sale of SITA's property, confidential information and trade secrets.

## COUNT VI

### (FLORIDA DECEPTIVE UNIFORM TRADE PRACTICES ACT)

86.

SITA repeats and re-alleges the allegations of Paragraphs 1-85 above as if the same were set forth verbatim herein.

87.

Defendants have committed unfair or deceptive acts by using their status as SITA employees to gain access to SITA's confidential source code and customers and to encourage them to terminate their PRA support contracts with SITA in favor of new contracts with Kronos, all in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("**FDUTPA**").

88.

Defendants are engaged in unfair methods of competition, unconscionable acts, and unfair or deceptive acts in the conduct of trade or commerce as set forth in Counts I, III, IV and V above.

89.

Defendants' actions constitute violations of FDUTPA because they are violations of Florida's laws respecting misappropriation of trade secrets, fraud, tortious interference with business relations and other similar laws which proscribe unfair methods of competition or unfair, deceptive and unconscionable acts and practices.

90.

SITA was damaged as a result of the unfair and deceptive acts of Defendants set forth herein.

91.

In addition, under FDUTPA, SITA is entitled to have Defendants temporarily and permanently enjoined from engaging in the wrongful activities set forth above.   Fla. Stat. § 501.211.

92.

Unless restrained by this Court, Defendants will continue their unlawful actions and SITA will be irreparably harmed.

93.

As a result of Defendants' unfair and deceptive trade practices, SITA is entitled to compensatory damages in an amount to be proven at trial.  SITA also is entitled to recover treble damages, punitive damages, costs and attorneys' fees.

## COUNT VII

## (CLAIM FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF)

94.

SITA repeats and re-alleges the allegations of Paragraphs 1-93 above as if the same were set forth verbatim herein.

95.

SITA has clearly ascertainable rights in need of protection, including at least the preservation of its source code, software, confidential information and trade secrets, and preventing the actual, threatened and/or ongoing misappropriation of the same, as well as the actual, threatened and/or ongoing misappropriation of SITA's customers.

96.

SITA has suffered, will continue to suffer, or will suffer if Defendants are not enjoined, immediate and irreparable harm as a result of Defendants' conduct as alleged herein for which SITA has no adequate remedy at law.

97.

SITA will continue to suffer immediate and irreparable harm as a result of Defendants' conduct for which SITA has no adequate remedy at law unless the Court enters a temporary restraining order and preliminary and permanent injunctions.

98.

Injunctive relief is necessary to protect SITA's rights during and after this litigation.

99.

The balance of equities weighs in favor of injunctive relief against Defendants in this matter.

100.

SITA has a reasonable likelihood of success on the merits of its claims.

101.

Therefore, pursuant to Rule 65 of the Federal Rules of Civil Procedure, SITA respectfully moves for an ex parte temporary restraining order:

(a)    enjoining Defendants and anyone acting in concert with them from using, copying, disclosing, transmitting, reviewing, distributing, discussing, transferring, commenting or relying on or referring to or otherwise misappropriating any trade secrets, confidential or proprietary information or other property belonging to SITA, particularly including SITA's PRA software, its source code, any related materials, and any knowledge or information concerning the PRA software.  As explained above, this injunction should be crafted to exclude XXXXXX so as to protect XXXXXX's ability to find and seek licensing approval of an appropriate support vendor for its implementation of the PRA software;

(b)    requiring Defendants and anyone acting in concert with them to immediately, and no later than two days after the entry of the Order, return to SITA any and all property of SITA, including but not limited to all confidential information, trade secrets and property described above, without retaining any copies or summaries thereof;

(c)    requiring Defendants to produce for forensic duplication and examination all personal computing devices in their possession, custody or control (whether personally owned or the property of Defendants or others), including any other devises containing storage capacity,

27

such as smart phones, flash drives, portable hard drives, laptops, memory sticks, *et cetera*, to ensure compliance with the injunction; and

(d)      ordering Defendants to preserve and not delete, destroy or conceal any and all evidence relevant to SITA's claims.

102.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, SITA further respectfully moves for a preliminary and permanent injunction enjoining Defendants and anyone acting in concert with them, from using, copying, disclosing, transmitting, reviewing, distributing, discussing, transferring, commenting or relying on or referring to or otherwise misappropriating any trade secrets, confidential or proprietary information or other property belonging to SITA.

**WHEREFORE**, SITA prays for the following relief:

(a)      that summons and process issue and Defendants be served according to law;

(b)      that SITA be granted preliminary and permanent injunctive relief restraining and enjoining Defendants from further breaches of the Separation Agreement, and theft of SITA's trade secrets;

(c)      that SITA be granted preliminary and permanent injunctive relief restraining and enjoining Defendants from further violations of the Florida and Georgia Trade Secrets Acts;

(d)      that the Court award SITA actual and compensatory damages in an amount to be determined at trial;

(e)      that the Court give SITA leave to seek punitive damages in an amount to be determined at trial;

(f)     on all available causes of action, that the Court award SITA its costs of suit and reasonable attorneys' fees incurred in connection with action;

(g)     on all available causes of action, that the Court award SITA prejudgment, post-judgment, and all other interests permitted by law; and

(h)     that the Court award SITA such other and further relief as the Court deems just and appropriate.

Respectfully submitted this 4th day of February, 2014.

DUANE MORRIS LLP

By:     s/ Lida Rodriguez-Taseff
        Lida Rodriguez-Taseff
        Florida Bar No. 039111
        200 S. Biscayne Blvd., Suite 3400
        Miami, Florida 33131
        (305) 960-2242
        (305) 960-2201 (fax)
        LRTaseff@duanemorris.com

CHAMBERLAIN HRDLICKA WHITE
WILLIAMS & AUGHTRY

        Annette A. Idalski
        Georgia Bar No. 005559
        *Pro Hac Vice pending*
        F. Beau Howard
        Georgia Bar No. 142641
        *Pro Hac Vice pending*
        191 Peachtree Street, N.E.
        Thirty-Fourth Floor
        Atlanta, Georgia 30303-1747
        (404) 659-1410
        (404) 659-1852 (fax)
        annette.idalski@chamberlainlaw.com
        beau.howard@chamberlainlaw.com

COUNSEL     FOR     PLAINTIFF     SITA
INFORMATION NETWORKING COMPUTING
USA, INC.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

SITA INFORMATION NETWORKING
COMPUTING USA, INC.,

         Plaintiff,

    v.

FAUSTO CAPOTE, HUGO CORDOVA and
KRONOS SOFTWARE SOLUTIONS, INC.,

         Defendants.

Civ. Act. No. _____

## VERIFICATION

Personally appeared before the undersigned officer, duly authorized by law to administer oaths, Keri Streicher, who, after first being duly sworn and deposed, states that the facts set forth in the foregoing Plaintiff's Verified Complaint & Application for Preliminary Injunction are true and correct to the best of her knowledge and belief.

This 4th day of February, 2014.

_____
KERI STREICHER

Sworn to and subscribed before me, and said

affiant being personally known to me, _Isabel Woodall_

this 4th day of February, 2014.